IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LORENE MOORER,
      Plaintiff,

vs.                             Case No. 3:06cv434/LAC/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Act and for Supplemental Security Income (SSI) benefits under Title XVI of the Act.

     Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.     PROCEDURAL HISTORY

     This suit involves two applications made under the Act.  The first is an application for DIB under Title II of the Act, 42 U.S.C. §§ 401–34 (Tr. 60-63).[1]  The second is an application for SSI

_____

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on December 27, 2006 (Doc. 6).

benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381–83 (Tr. 417–20). Plaintiff's applications were denied initially (Tr. 24, 26–29, 421–25) and on reconsideration (Tr. 25, 32–34, 426–30). On March 23, 2006, following a hearing, an administrative law judge (ALJ) found that Plaintiff was not under a "disability" as defined in the Act at any time through the date of the decision (Tr. 11–22). On September 14, 2006, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 5–7). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998). This appeal followed.

II.    FINDINGS OF THE ALJ

On March 23, 2006, the ALJ made several findings relative to the issues raised in this appeal (Tr. 14–22):

1)    Plaintiff meets the insured status requirements of the Act through March 31, 2008.

2)    Plaintiff has not engaged in substantial gainful activity at any time relevant to the ALJ's decision (20 C.F.R. §§ 404.1520(b) and 416.920(b))[2] (although Plaintiff indicated that she performed part-time work activity after her alleged disability onset date, earnings records were not able to be obtained prior to the rendering of the ALJ's decision; thus, no evidence exists suggesting that Plaintiff's work activity was performed at a substantial and gainful level).

3)    Plaintiff has the following severe impairments: lupus, hypertension, hypothyroidism, status post thyroidectomy surgery, tear in the medial meniscus of the left knee, cervical strain, cardiomegaly, and asthma (20 C.F.R. § 404.1520(c)).

4)    Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).

5)    Plaintiff has the residual functional capacity (RFC) to occasionally lift or carry up to fifty pounds; sit, stand or walk at least eight hours in an eight-hour workday, use

---

[2]In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims (see 20 C.F.R. §§ 404, 416). Therefore, hereafter, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

her hands and feet without limitation; continuously balance, reach, handle, feel, hear and speak, with limitations as to being able to only occasionally, climb, stoop, crouch, kneel, crawl, and push or pull.

6)      Plaintiff is capable of performing her past relevant work as a cook, which is classified as medium and skilled; caterer helper, which is classified as light and semiskilled; and cashier, which is classified as sedentary and skilled — this work does not require the performance of work-related activities precluded by Plaintiff's RFC (20 C.F.R. § 404.1565).

7)      Plaintiff has not been under a "disability," as defined in the Act, during any relevant period of disability considered by the ALJ (20 C.F.R. § 404.1520(f)).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d

1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen,

786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.    Personal History

Plaintiff was born on December 6, 1956, and has a high school education (Tr. 61, 87).  She was married in 1989 and has two children (Tr. 61–62).  Prior to Plaintiff's alleged disability, she worked as a waitress, grocery clerk, cook, and cake shop clerk (Tr. 82, 101).  Part of her duties included stocking a pantry and carrying ice, which required some lifting of up to fifty pounds and frequent lifting of twenty-five pounds (Tr. 92).[3]  Plaintiff alleges that she became disabled on March 30, 2003, due to high blood pressure, "pinched nerves," and asthma, although she indicated she was first bothered by her symptoms in January 1987 (Tr. 61, 81–82).  At the time Plaintiff applied for benefits, she noted that she was 5'8" and weighed 208 pounds (see Tr. 81).  She alleged that her ailments caused pain, and her medication made her sleepy, which prevented her from driving or operating machinery (Tr. 81; see also Tr. 86 (a listing of Plaintiff's medications and their side effects)).  Plaintiff specifically noted that she experienced shortness of breath and daily chest pain, although she had never been hospitalized for a heart attack, never had a heart catheterization or angiography, and never had an exercise EKG (Tr. 109–11).  She noted that her chest pain lasted about an hour and radiated through her neck and down her arms into her fingers (Tr. 112).  Plaintiff indicated that she finally quit working on March 30, 2003, after reducing her work from full time to part time, "because [her] blood pressure would not go down, and [she] had trouble breathing and [] tired easily" (Tr. 82).

With regard to activities of daily living after her alleged onset of disability, Plaintiff noted that pain prevents her from sleeping and driving the "majority of the time" and "sometimes" limits her ability to cook and prepare meals, clean or maintain the house, do laundry, shop, and participate in social activities or hobbies, but it does not interfere at all with her ability to bathe, dress, take care

---

[3]Elsewhere Plaintiff indicated that she never lifted more than forty pounds and frequently lifted only ten (or up to ten) pounds (see, e.g., Tr. 102).

of her hair, and care for children (Tr. 113–14).[4]  To relieve her pain, Plaintiff has seen a chiropractor for "physical manipulation" and utilized a TENS unit (Tr. 113, 119).

At her hearing before the ALJ on March 29, 2005, Plaintiff testified that she cannot lift more than ten pounds (Tr. 431, 435–36).  On a typical day she gets her children ready for school, straightens their bed, and then watches television "all day" (Tr. 436–37, 453).  When asked whether she has trouble sitting through a TV program, Plaintiff responded that she gets up and down (Tr. 438).  Plaintiff explained that her chest hurts and she has headaches, which probably result from her high blood pressure, and she sits or reclines to alleviate the discomfort (Tr. 441, 444).  Plaintiff noted that she has headaches approximately three times a week, although she indicated that the pain eases off after about an hour if she takes her blood pressure medication, but at the same time, the medication makes her sleepy so she needs to nap (Tr. 447–48).  She also has shortness of breath, which results from her asthma, and she had an asthma attack in December 2002 (Tr. 442).  Plaintiff further testified that she was in an automobile accident in 2002 and since then she has daily pain in the back of her neck and down her left arm (Tr. 445–46).  She noted that a chiropractor told her she has a pinched nerve in the back of her neck (Tr. 458).  She further noted that she has trouble lifting with her left arm, but she is right-handed and does not use her left arm much (Tr. 446).  Tylenol eases Plaintiff's arm and neck pain, and her doctor has offered a shot for further pain relief, but Plaintiff is "scared of that long needle" and has therefore not tried injections for pain relief (Tr. 447).  Plaintiff testified that she has recently been diagnosed with lupus, which makes her "body hurt[]" in many areas, such as her legs, ankles, side, back, and chest (Tr. 449).  Plaintiff explained that her knees get stiff, she cannot stand longer than fifteen minutes without her legs hurting, she can walk for only five minutes, she can sit for only fifteen minutes at the most, and she lacks energy (Tr. 449–52).  Plaintiff testified that she does some work around the house, but it was more limited than what she described when she applied for benefits (*see* Tr. 453).  She noted that she lies down about two hours each day (Tr. 455).  She also noted that she drives occasionally, and has driven her children to school, which is about ten miles from her house (Tr. 464–65).  When Plaintiff was asked to rank her problems, she testified that her leg pain was the worst, followed by her left arm pain, and

---

[4]Plaintiff specifically stated, "I am able to care for my personal needs" (Tr. 120; *see also* Tr. 465).

then her asthma, shortness of breath, and chest pain (*see* Tr. 459–62).  She stated that she could sit eight hours a day, in one-hour increments, if she is able to get "up and down" (Tr. 466–67).[5]  She disagreed with her doctor's opinion that she could sit in three-hour increments and his opinion that she could walk three hours at a time (*id.*).

B.     Relevant Medical History, as Summarized by the ALJ and Plaintiff's Attorney[6]

The record reflects that Bascam Raney, M.D., or his nurse practitioner assistant, treated Plaintiff from at least 2001 through May of 2004 (Tr. 212–302, 359–60).  In April 2003, Dr. Raney noted that an echocardiogram from March 28, 2003 revealed mild to moderate mitral regurgitation with an ejection fraction of 55% to 60%.[7]  Plaintiff was diagnosed with hypertension, mild cardiac valve disease, and hypokalemia.  Dr. Raney prescribed a continuation of Toprol and HCTZ medications.  Two months later, Dr. Raney examined Plaintiff and noted complaints of left leg pain for about a month, as well as neck pain.  He prescribed Flexeril and noted that Plaintiff was participating in physical therapy.  At that time, Plaintiff was undergoing chiropractic therapy, using a TENS unit, and taking Skelaxin.  It was noted that Plaintiff was unable to work due to pain and elevated blood pressure (Tr. 216).  Dr. Raney discontinued the Skelaxin, prescribed Flexeril, and indicated that Plaintiff would be unable to work until she was reevaluated (Tr. 216–17).  In July 2003, Dr. Raney examined Plaintiff and noted her complaints regarding neck pain and uncontrolled hypertension.  He indicated that Plaintiff had possible "CDD" and scheduled an MRI.  In addition, Dr. Raney continued Plaintiff's prescription for Flexeril and continued to place Plaintiff in a

---

[5]During her testimony, Plaintiff made no mention of her weight and gave the ALJ no indication that it interfered with her ability to perform work or daily activities.  She attributed her leg pain to her recent diagnosis of lupus (*see, e.g.*, Tr. 460).

[6]As noted by the ALJ, Plaintiff submitted numerous extraneous medical records with her application for benefits that do not pertain to her alleged disability (*see* Tr. 18).  They are identified as Exhibit 1F (childbirth), Exhibit 2F (sterilization), Exhibit 3F (swollen face), Exhibit 4F (hysterectomy), Exhibit 5F (breast lump), and Exhibit 6F (goiter removal) (*see* Tr. 18).  These records, which consist of pages 134–63 of the transcript, are therefore not summarized by the undersigned in this report and recommendation (R & R) (*id.*).  Further, unless otherwise indicated, the summary of the medical evidence is this R & R is taken from either the ALJ's opinion or Plaintiff's memorandum in support of her complaint (*see* Tr. 17, 19–20; Doc. 9 at 4–8).

[7]The medical records also indicate that in March 2003 Plaintiff was suffering neck pain radiating into her left arm after a motor vehicle accident (Tr. 219–23).  She was also continuing to have heart palpitations and fullness in her chest (Tr. 219).  Additionally, mild edema, blurred vision, and headaches were noted (*id.*).

non-working status due to uncontrolled blood pressure, chronic neck pain, and myofascial syndrome (Tr. 215).   Plaintiff missed her two-week follow-up appointment.   In August 2003, Dr. Raney examined Plaintiff and noted that an MRI of her C-spine was negative, although he noted that Plaintiff had continued neck pain and ankle swelling.   Plaintiff was diagnosed with hypertension, pedal edema — mild, and cervical strain syndrome, and he continued Plaintiff on her treatment regimen.   One and a half months later, in October 2003, Dr. Raney examined Plaintiff and noted her complaints as to radiating neck pain and left arm pain.   He also noted that an MRI of the neck dated July 22, 2003, was normal.   He diagnosed Plaintiff with cervical strain syndrome and continued Plaintiff's prescription for Flexeril.   On October 7, 2003, Dr. Raney completed a functional capacity evaluation form and a pain questionnaire with the assistance of a physical therapist (Tr. 212, 303–07).   Dr. Raney indicated that Plaintiff could sit eight hours, but she could only stand or walk a maximum of five minutes because she suffers from shortness of breath (Tr. 303).   Additionally, Dr. Raney indicated that Plaintiff needed to rest, recline or lie down several times per day; could lift a maximum of ten pounds occasionally; was unable to squat or crawl; could only occasionally bend or climb stairs; had moderate restrictions in driving or being around machinery, as her medications made it difficult to focus; and was restricted totally from unprotected heights (Tr. 303–05).   Further, Dr. Raney indicated that Plaintiff suffered pain to such a degree as to be distracting to adequate performance of daily activities or work and that physical activity, such as moving her arms, would greatly increase her pain to such a degree to cause distraction from tasks or to total abandonment of tasks (Tr. 305–06).   Finally, Dr. Raney stated that the side effects of Plaintiff's medications could be expected to be severe and limit her effectiveness due to distraction, inattention and drowsiness (Tr. 304, 307).

Dr. Raney did not examine Plaintiff until three months later, in January 2004.   He noted that Plaintiff continued to complain of "occasional" neck pain, and "now" she also complained of low back pain with radiation into the right lower extremity for several months.   Dr. Raney noted that Plaintiff maintained that she was unable to work, and he wrote a letter to the food stamp office to that effect.   Two months later, Plaintiff failed to show for her follow-up appointment.   Dr. Raney did not examine Plaintiff subsequent to this date; however, he continued to prescribe medications for Plaintiff through May 2004.   The record does not reflect that he ever prescribed narcotic pain

medications, pain management therapy, surgery, or other invasive procedures to treat Plaintiff's conditions.

Plaintiff's medical history is also significant for asthma, for which she frequently used inhalers. Pulmonary function studies conducted for the Division of Disability Determinations (DDS) on July 3, 2003 indicated a pre-bronchodilatation Forced Vital Capacity (FVC) of 2.27, 1.49, and 1.28 liters on three attempts (Tr. 178–81). The FVC post-bronchodilatation was 2.00, 1.79, and 1.32 liters. Forced Expiratory Volume (FEV) pre-bronchodilatation was 1.70, 1.10, and .94 liters on each attempt. FEV post-bronchodilatation was 1.52, 1.34, and .97 liters (*id.*). A moderate restriction was indicated with no significant improvements post-bronchodilator (Tr. 180). The report summary states that none of the three tests were acceptable, but it does not indicate the reasoning therefore (*id.*).

Malaika Hakima, M.D., treated Plaintiff from May of 2004 through February of 2005 (Tr. 397–408). Her impression was mixed connective tissue disease, chronic obstructive pulmonary disease, meniscus tear in the left knee, and cardiomegaly (Tr. 399). She referred Plaintiff to a pulmonalogist, rheumatolgist, and cardiologist due to her multiple symptoms including joint pain, edema, chest pressure/discomfort, asthma, and left knee swelling (Tr. 397–400).

Pulmonary function studies were again performed on August 31, 2004. These studies revealed a moderate restrictive ventilatory defect supported by a moderately reduced FVC. The studies also suggested a superimposed early obstructive pulmonary impairment (Tr. 369). X-rays performed on the same day identified cardiomegaly accentuated by pectus excavatum. An MRI performed on August 31, 2004 of the left knee revealed that Plaintiff was suffering from a small joint effusion and suggested a minimal tear extending to the inferior surface (Tr. 371).

On October 14, 2004, Plaintiff began treating with Jack Obeid, M.D., a pulmonary specialist. At that time, Plaintiff indicated that her problems were shortness of breath, chest pain, difficulty breathing at night, swollen feet and legs, high blood pressure, joint pain and swelling, headaches, and sensitivity in her hands (Tr. 416). Her primary complaint was a history of dyspnea on exertion (Tr. 412). Plaintiff was then using two inhalers and taking several other prescription medications (*id.*). Dr. Obeid ordered pulmonary function testing (PFT) and a chest radiography. The PFT revealed a restrictive defect with reduced diffusion capacity, and the chest radiography revealed

cardiomegaly and pulmonary vascular congestion (Tr. 411).   His assessment was dyspnea, congestive heart failure, and suspected diastolic dysfunction (*id.*).  Dr. Obeid discontinued Plaintiff's Advair prescription and began Plaintiff on Lasix, which provided some improvement (Tr. 409–11). Dr. Obeid referred Plaintiff to a cardiologist and recommended a follow-up appointment in four months (Tr. 409).

On February 16, 2005, Nancy Morris, M.D., a rheumatologist, examined Plaintiff based on a referral from Dr. Hakima and secondary to a possible diagnosis of Lupus.  She noted Plaintiff's complaints of recent pain and swelling in her right knee and elbow, as well as a history of left knee pain (Tr. 388).  Dr. Morris indicated that Dr. Hakima had recorded positive ANA test results.  Dr. Morris' diagnosis was Systemic Lupus Erythematosus, and Dr. Morris started Plaintiff on Plaquenil and recommended a follow-up appointment within three weeks (*id.*).  The following month, March 2005, Dr. Morris noted an overall increase in Plaintiff's energy level, and she opined in treatment notes that Plaintiff's arthralgias "seemed improved given the longer duration of Plaquenil use" (Tr. 386–87).  She scheduled a three-month follow-up and noted that if Plaintiff's condition was improved at the follow-up session, examinations every six months would be warranted.

C.      Other Information Within Plaintiff's Claim File

J. Patrick Neal, M.D., a DDS physician, completed a Physical RFC Assessment on July 20, 2003 (Tr. 186–93).  Dr. Neal opined that Plaintiff was able to frequently lift or carry twenty-five pounds and occasionally lift or carry fifty pounds.  She could sit, stand, or walk six hours in an eight-hour workday (Tr. 187).  Her ability to push or pull was unlimited (*id.*).  No postural, manipulative, visual, or communicative limitations were noted, although Plaintiff was to avoid concentrated environmental exposures (Tr. 188–90).

Todd A. Paterson, D.O., also a DDS physician, completed a Physical RFC Assessment on November 6, 2003 (Tr. 333–40).  Dr. Patterson opined that Plaintiff was able to lift or carry twenty pounds occasionally and ten pounds frequently, and she could sit, stand, or walk six hours in an eight-hour workday (Tr. 334).  Her ability to push or pull was unlimited (*id.*).  No postural, manipulative, visual, environmental, or communicative limitations were established (Tr. 335–37).

Emily Stinnett, D.C., conducted a physical capacity evaluation (PCE) on November 11, 2003 (*see* Tr. 345–58).  In particular, Dr. Sinnett conducted range of motion testing, a strength evaluation,

a "pinch/grip" test, and comparative muscle testing (*see* Tr. 347–58).  Dr. Stinnett also completed a PCE form, concluding that Plaintiff could sit eight hours a day in three-hour increments; stand or walk four hours a day in three-hour increments; lift up to ten pounds with her right hand and up to five pounds with her left hand, but she could not carry or sustain lifting using her left hand "for any length of time"; Plaintiff could grasp, push, pull, or finely manipulate with her right hand, but not her left; she could also use both feet for repetitive movement; but Plaintiff would need to rest, recline, or lie down several times a day (Tr. 380–81).  Additionally, Plaintiff would be precluded from driving or being around machinery when medicated, and her current prescriptions could interfere with her ability to work because they could make her sleepy or cause "visual side effects" (Tr. 382).  Regarding pain, Dr. Stinnett indicated that Plaintiff's pain is "present to such an extent as to be distracting to the adequate performance of work activities," physical activity would cause Plaintiff's pain to increase somewhat, but side effects of Plaintiff's medications should not cause serious problems in most instances (Tr. 383–84).  Finally, Dr. Stinnett provided inconsistent opinions about Plaintiff's allegations of pain; on the PCE, Dr. Sinnett indicated that Plaintiff's allegations of pain are consistent with clinical findings (Tr. 382), but on the pain questionnaire she indicated that Plaintiff did not have an underlying medical condition that was consistent with the pain she experiences (Tr. 384).

In October 2004, Leo Chen, M.D., a specialist in orthopaedic surgery, performed a consultative physical examination of Plaintiff (*see* Tr. 361, 367).  He found full range of motion throughout Plaintiff's "whole system" (Tr. 363).  He felt that her only limitations would be those related to her left knee; however, he also found that her left knee condition was likely only temporary and would resolve with treatment (*see* Tr. 363).  Specifically, Dr. Chen opined that Plaintiff could lift or carry up to fifty pounds, that standing and walking were not "affected by any impairment," and that the use of Plaintiff's hands and feet was not affected at all (Tr. 364–67).

Finally, a vocational expert (VE) testified at Plaintiff's hearing before the ALJ on March 29, 2005 (Tr. 431, 468–77).  Initially, Plaintiff was classified as a younger individual with a high school education (Tr. 469).  Next, the VE classified Plaintiff's past relevant work as a cook (medium exertional level — Specific Vocational Preparation level (SVP) 6) and caterer helper (light exertional level — SVP 3), and Plaintiff conceded that the VE's classification of her past work was

accurate (*id.*).  The VE then testified that if Dr. Chen's assessment was fully credited, Plaintiff could return to her past work (Tr. 469–70).  If Dr. Patterson's more limited assessment was fully credited, however, which is essentially an RFC for light work, Plaintiff could return only to her past work as a caterer helper (Tr. 470).  Generally, the VE noted that Dr. Chen's assessment permitted the full range of light work and about 85% of the range of medium work, which equates to an estimated twenty-million jobs (*id.*).  If Plaintiff was limited to light work, as assessed by Dr. Patterson, she would qualify for fifteen to eighteen-million jobs, and she could perform the full range of sedentary work, with three to four-million jobs in that category (Tr. 471–72).  The VE next considered Dr. Raney's PCE and testified that Plaintiff could not return to her past work or perform any other work if his limitations were fully credited (Tr. 472).  If Dr. Raney's restriction regarding Plaintiff's need to recline several times a day was lifted, however, Plaintiff could perform available sedentary jobs (Tr. 472–73).[8]  Finally, the VE opined that if Dr. Stinnett's opinions were fully accepted, Plaintiff could not return to her past work or any other work (Tr. 475).

V.    DISCUSSION

Plaintiff alleges the ALJ erred in concluding that she could return to her past relevant work as a cook (medium exertional level) and caterer helper (light exertional level) (Doc. 9 at 9).[9]  More specifically, Plaintiff contends the ALJ erred in reaching this conclusion because he improperly discounted the opinion of Plaintiff's treating physician, failed to apply the Eleventh Circuit pain standard, failed to properly consider the effects of Plaintiff's obesity, and erred in his questioning of the VE (*id.* at 9–19).  The Commissioner contends that its decision finding that Plaintiff was not disabled, within the meaning of the Act, is supported by substantial evidence and should be affirmed (Doc. 12).

_____

[8]The court notes that portions of the VE's testimony are difficult to follow, as the ALJ's questioning referenced different exhibits at the same time, and it is sometimes unclear as to which exhibit he referred.  Additionally, as noted by the ALJ, Exhibit 12F (Tr. 207–11) and 25F (Tr. 379–84) are duplicates (they are Dr. Stinnett's PCE) and Clinical Assessment of Pain.

[9]Although not mentioned in Plaintiff's brief, the ALJ also found that Plaintiff could return to her past work as a cashier, which is classified as sedentary (*see* Tr. 21).  Plaintiff has not specifically challenged this finding, but because it was based on a rejection of Dr. Raney and/or Dr. Stinnett's opinion, the court shall address the merits of each of Plaintiff's arguments nonetheless.

A.      Opinion of Plaintiff's Treating Physician

Plaintiff asserts that the ALJ failed to give proper weight to the opinions of her treating physician, Dr. Raney, which were rendered on October 7, 2003 and which are contained on a functional capacity evaluation form and a pain questionnaire (*see* Doc. 9 at 9–14; *see also* Tr. 303–07).

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis, 125 F.3d at 1439–41; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Comm'r of Social Security,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making

the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner.  20 C.F.R. § 404.1527(e).  The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims.   The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner.   For instance, 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion.  Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner.  20 C.F.R. § 404.1527(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record. SSR 96-5p. In Lewis, 125 F.3d at 1441, the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do any work, and the physician subsequently wrote a letter saying the claimant was completely disabled.   To require the Commissioner to accept as controlling a statement that a patient is or is not disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters.   Additionally, a physician's opinion on whether a person is able to work may be colored by such things as the

physician's knowledge of local hiring practices, whether there are specific job vacancies, a person's reluctance to do a particular kind of work, and similar matters.  These things are not properly considered by the Commissioner in determining disability.  20 C.F.R. § 404.1566.  For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not a conclusive medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

Finally, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.  *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

In the instant case, in rejecting Dr. Raney's opinions, the ALJ first found that his "form" opinions were inconsistent with treatment notes he made the same day the form opinions were rendered (Tr. 21, 303–07).  In treatment notes dated October 7, 2003, Dr. Raney noted that Plaintiff continued to complain of neck pain (Tr. 212).  However, immediately after noting Plaintiff's complaint, Dr. Raney indicated that a July 2003 MRI of the neck was normal, as was a cervical spine x-ray (Tr. 21, 212).  Moreover, Plaintiff's range of motion in her neck was intact, with only "mild" paracervical musculoskeletal tension and "mild" pain radiating to the upper trapezius muscles bilaterally — nowhere did Dr. Raney indicate that Plaintiff's pain was anything greater than "mild" (*see* Tr. 212).[10]  Thus, the ALJ correctly found that Dr. Raney's characterization of Plaintiff's pain as being present to "such an extent as to be distracting to adequate performance of daily activities or work," was inconsistent with the characterization in his treatment notes of "mild" pain made the same day  (Tr. 21, 306).

---

[10]Plaintiff contends the ALJ erred in finding that Dr. Raney characterized Plaintiff's pain as "mild," asserting that "[Dr. Raney] does not indicate Plaintiff's pain to be 'mild'" (Doc. 9 at 10).   A review of the record, however, reveals that Dr. Raney indeed characterized Plaintiff's pain as mild in treatment notes dated October 7, 2003 (*see* Tr. 212).

Plaintiff argues to the contrary, asserting that Dr. Raney's treatment notes are consistent with the opinions he rendered on October 7, 2003, specifically noting that Dr. Raney placed Plaintiff in a "no work" status on two occasions prior to recording those opinions.  However, the court first notes that in discrediting Dr. Raney's opinions the ALJ stated that the opinions were inconsistent with the treatment notes <u>dated the same day of the opinions</u>, which as noted above, the court finds to be an accurate characterization.  Moreover, the fact that Dr. Raney had previously placed Plaintiff on a "no work" status does not compel a finding that the opinions rendered on October 7, 2003 are consistent with all of Dr. Raney's treatment notes.  Indeed, the "no work" restrictions were rendered on May 19, 2003 and July 16, 2003 (Tr. 215, 217).  The restriction dated May 19 is written by nurse, indicates that Plaintiff is unable to work for one month, and notes that Plaintiff will need to be reevaluated (*see* Tr. 217).  Additionally, it was recommended on May 19 that Plaintiff obtain an "X-ray [and] C-spine" (Tr. 216).  Plaintiff failed to appear for her follow-up appointment on June 2, 2003 (*see* Tr. 216).  When Plaintiff returned on July 16, 2003, Dr. Raney wrote a note indicating that Plaintiff was unable to return to work (Tr. 215).  However, Dr. Raney's treatment notes again indicate that Plaintiff was to obtain an "MRI of the cervical spine" (Tr. 214).  Plaintiff again failed to return for a follow-up appointment (*see* Tr. 214), and when she returned to Dr. Raney on August 18, 2003, he noted that the "MRI and x-ray of the C spine were negative"[11] (Tr. 213).  Thus, it appears that the work restrictions were temporary and likely issued as a cautionary measure pending the results of Plaintiff's MRI and x-ray tests.  Furthermore, even if Dr. Raney's work restrictions had been permanent restrictions, the ALJ would not have bound by those restrictions, as the question of whether a claimant is disabled (that is, unable to work within the strictures of the Social Security Act) is reserved to the Commissioner, not to a physician.  *See* 20 C.F.R. § 404.1503.  It is the physician's evaluation of a Plaintiff's condition and the medical consequences thereof, "not their opinions of the legal consequences of [her] condition" on which the court must focus.  <u>Lewis</u> 125 F.3d 1436.

In further discrediting Dr. Raney's opinions, the ALJ noted that Dr. Raney "did not during his course of treatment prescribe[] pain medications, refer the claimant to pain management therapy

---

[11]Plaintiff underwent these tests on July 22, 2003 (*see* Tr. 212), after the work restrictions were issued.

or advi[s]e more invasive procedures to treat [Plaintiff's] conditions (Tr. 21). Plaintiff contends that this reasoning of the ALJ is erroneous. Specifically, Plaintiff asserts that "more invasive treatment in the form of injections were offered to Plaintiff; however, she was too afraid of needles to agree to such treatment" (Doc. 9 at 11). In support, Plaintiff refers to her testimony during her hearing before the ALJ (*see id.* (referring to Tr. 447)), at which time Plaintiff testified that "they [i.e., unspecified doctors] told me they could give me a shot but I don't know that I want to do the shot . . . [because] I'm scared of that long needle" (Tr. 447). It is unclear from Plaintiff's testimony that any shots were offered to her by Dr. Raney, and Plaintiff has not referred the court to any reference in Dr. Raney's treatment notes reflecting that he was the doctor who recommended injections (if any doctor made such a recommendation). Indeed, a review of Dr. Raney's records reflects a consistent course of prescribing only medication to treat Plaintiff, even during the time Plaintiff was issued the two work restrictions (*see, e.g.*, Tr. 214–17). Thus, the ALJ's finding that Plaintiff's treating physician failed to recommend invasive treatment is supported by the record. *See* Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996) (an ALJ may properly consider treatment that is "entirely conservative in nature" in discrediting a claimant's testimony). Furthermore, even if Dr. Raney had recommended injections, by Plaintiff's own admission she refused to follow his recommendation, which suggests that her pain was not as severe as she alleged. *See* Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) ("[T]he ALJ's consideration of Ellison's noncompliance as a factor in discrediting Ellison's allegations of disability is adequately supported . . . ."); *see also* Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability).[12]

Finally, in rejecting Dr. Raney's opinion, the ALJ also considered Dr. Raney's indication that Plaintiff would experience shortness of breath after five minutes of standing or walking, but he did not list her asthma medications or the use of them in the functional assessment (Tr. 21, 303). Plaintiff asserts that this "reasoning makes no sense at all," pointing out that the assessment did not provide any place for Dr. Raney to list medications (Doc. 9 at 12). Plaintiff is correct in her assertion that the form did not provide any place for Dr. Raney to list all of Plaintiff's medications;

---

[12]This court concludes that fear of a long needle is not a "good reason" to disregard a physician's advice.

he was asked only to list those that might interfere with her ability to work, and in that section he listed Plaintiff's "BP meds and Clonodine"[13] (*see* Tr. 304).  Thus, it appears that Dr. Raney failed to list Plaintiff's asthma medication on the assessment because it did not interfere with her ability to work, and the ALJ improperly relied on this particular reason in discrediting the opinion of Dr. Raney.  Misstatements by an ALJ, however, can constitute harmless error.  *See* Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (misstatements harmless where ALJ applied correct legal standard despite the first misstatement, and the second misstatement was irrelevant); *see also* East v. Barnhart, 197 Fed. Appx. 899, 901 n.3 (11th Cir. 2006) (failure to mention psychologist's report harmless where findings in report were consistent with ALJ's ultimate determination); Pichette v. Barnhart, 185 Fed. Appx. 855, 856 (11th Cir. 2006) (ALJ's erroneous statements found to be harmless where ALJ applied proper legal standard).  Thus, the court must determine whether the ALJ committed harmless error.

Here, the ALJ provided additional reasons for discounting Dr. Raney's opinion that Plaintiff could not stand or walk for more than five minutes.  Specifically, the ALJ went on to say that "[Plaintiff] has a history of asthma treatment dating to childhood and has been able to work productively with [her] condition for several years.  In addition, her condition quickly improved with medication." (Tr. 21).  Each of these reasons has substantial support in the record.  First, Plaintiff's earnings records reflect employment from 1988 through 2003, or approximately sixteen consecutive years of employment (*see, e.g.*, Tr. 64).  Plaintiff acknowledges this, but argues that "obviously her condition worsened" (Doc. 9 at 12).  In support, Plaintiff notes that her "lung disease was not truly asthma at all . . . [Plaintiff] suffered from cardiomegaly (an enlarged heart), possible congestive heart failure, a restrictive ventilatory defect of the lungs, pulmonary vascular congestion and diastolic dysfunction" (*id.* at 12–13 (referencing the records of Dr. Obeid, who Plaintiff saw on three occasions between October and December 2004 (Tr. 409–13))).

Initially, the court notes that when Plaintiff first saw Dr. Obeid on October 14, 2004, his assessment was "dyspnea on exertion, most likely secondary to asthma," but her lungs had good

---

[13]It is believed that the medication referred to is actually "clonidine," which is most often prescribed for the treatment of hypertension (*see* Tr. 223; *see also* http://www.medicinenet.com/clonidine/article.htm (last visited October 12, 2007)).

breath sounds bilaterally, with no wheezing (Tr. 412). He indicated that PFT would be necessary to ascertain the cause of Plaintiff's dyspnea (*id.*). When he next saw Plaintiff on November 15, 2004, Dr. Obeid indicated that "PFTs revealed a restrictive defect with reduced diffusion capacity," and he assessed "dyspnea on exertion with radiographic and PFT findings suggestive of congestive heart failure. Suspect diastolic dysfunction from long-standing hypertension" (Tr. 411). Finally, when Dr. Obeid last saw Plaintiff on December 27, 2004, his assessment was "dyspnea on exertion, suspect secondary to congestive heart failure and pulmonary vascular congestion" (Tr. 409). By then, however, Plaintiff's medications had been adjusted (from the use of an inhaler to Lasix), and Dr. Obeid noted that she was feeling better and her shortness of breath was improving (*id.*). Based on these facts, Plaintiff in effect suggests that she has been misdiagnosed with asthma most of her life, and the severity of her situation was never known until she was diagnosed and properly treated by a physician who saw her only three times. The court disagrees for several reasons.

First, Plaintiff has consistently maintained that she suffers from asthma (*see, e.g.*, Doc. 9 at 2 (Plaintiff's memorandum in support of her complaint, stating "Ms. Moorer alleges that she suffers from . . . asthma . . ."); Tr. 442 (Plaintiff testified before the ALJ that she has asthma)) and only now has claimed that her lung disease "was not truly asthma at all." Moreover, although Plaintiff improved on Lasix during the three-month period she saw Dr. Obeid, the record reflects that inhalers were similarly effective during the time she was treated by Dr. Raney. For example, on February 3, 2003, Plaintiff reported that Combivent, an inhaler, had been helpful for her shortness of breath (Tr. 221). Next, Plaintiff denied any shortness of breath on February 17, 2003 (Tr. 220), and as noted by the ALJ, denied any shortness of breath on March 26, 2003 (Tr. 17, 219). Additionally, although Plaintiff's prescription for an inhaler was renewed on April 10, 2003, she did not report any shortness of breath on that day (Tr. 218), and she did not report any on her next visit on May 19, 2003 (Tr. 216). In fact, on May 19, 2003, Plaintiff reported that she was unable to work "due to neck and arm pain and stress resulting in elevated blood pressure," and she made no mention of any shortness of breath (Tr. 217). Similarly, Dr. Raney's notes reflect that Plaintiff's lungs were consistently clear after she was provided with a prescription for an inhaler in January 2003 (*see, e.g.*, Tr. 214 (Plaintiff's lungs noted to be "clear" on July 16, 2003; Tr. 213 (same on August 18, 2003);

*see also* Tr. 221 (Plaintiff's lungs were noted to be "CTA" on February 3, 2003);[14] Tr. 220 (same on February 17, 2003); Tr. 219 (same on March 26, 2003); Tr. 218 (same on April 10, 2003); Tr. 216 (same on May 19, 2003)).  Moreover, the court notes that when Dr. Raney issued Plaintiff the work restrictions, discussed *supra*, they were not based on Plaintiff's inability to breathe or asthmatic condition.  One indicated that Plaintiff was unable to work because she had hypertension and neck pain, and the other restriction was based only on Plaintiff's neck injury (*see* Tr. 215, 217).

Next, the record contains pulmonary function tests dated July 3, 2003 and August 31, 2004, prior to Plaintiff's becoming a patient of Dr. Obeid, both of which recorded FVC values that are not considered disabling under Listing 3.02B, Chronic Restrictive Ventilatory Disease (*see* Tr. 17 (referencing Tr. 178–81; 369–77)); similarly, the record contains two FEV readings from the same dates, neither of which indicate presumptive disability under Listing 3.02A, Chronic Pulmonary Insufficiency (*see id.*).  Moreover, albeit in a different discussion, the ALJ properly found that Plaintiff had experienced only one asthma attack which required emergency room treatment during the relevant time period (Tr. 17, 166), and Plaintiff confirmed this during her testimony (Tr. 442).

Thus, the record confirms that Plaintiff was able to work productively for years despite her asthmatic condition and that she improved with medication, both with the use of inhalers during her treatment with Dr. Raney and with the use of Lasix during her treatment with Dr. Obeid.  As noted by the court in Dawkins, 848 F.2d at 1213, a medical condition is not disabling if it can reasonably be remedied by surgery, treatment, or medication.  The court concludes, therefore, that the ALJ's one misstatement regarding Plaintiff's asthma medication constitutes harmless error because his other reasons for discounting Dr. Raney's opinion that Plaintiff could stand or walk for only five minutes have substantial support in the record.[15]

---

[14]It is believed that CTA means "clear to auscultation."  *See* http://www.medilexicon.com, search for CTA (last visited October 12, 2007).

[15]The court notes that Plaintiff herself indicated on March 13, 2005 that she could walk or stand for fifteen minutes (Tr. 133), and she testified on March 29, 2005 that she could stand for fifteen minutes (Tr. 450).  Thus, Plaintiff's own estimation of her abilities contradicts Dr. Raney's.

In conclusion, the court finds that all of the ALJ's reasons for discounting the opinions of Dr. Raney have substantial support in the record, except one. However, the court finds that the one misstatement by the ALJ constitutes harmless error. *See Pichette*, 185 Fed. Appx. at 856 (ALJ's erroneous statements found to be harmless where ALJ applied proper legal standard). Thus, the ALJ properly discounted the opinion of Dr. Raney.[16]

In a related discussion, Plaintiff contends that the ALJ erred in assigning "significant weight" to the opinion of Dr. Chen, a physician who examined Plaintiff at the request of DDS. The ALJ concluded that Dr. Chen's opinion "comports to the evidence of record as a whole" and "his report is based on an examination of the [Plaintiff], as well as objective documentation to include MRI images of the lumbar and cervical spine" (Tr. 21).

The opinion of a consultative examiner is not entitled to the same degree of weight as that of a treating physician; however, where substantial record evidence supports the ALJ's decision to discount a treating physician's opinion, the opinion of an examining physician itself becomes entitled to significant weight. *See* 20 C.F.R. § 404.1527(d); Richardson v. Perales, 402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (report of consultative examiner may constitute substantial evidence supportive of a finding adverse to a claimant). Thus, having properly discounted Dr. Raney's opinion, the ALJ could properly assign "significant weight" to Dr. Chen's opinion. Moreover, the ALJ's reasons for crediting Dr. Chen's opinion have substantial support in the record. In pertinent part, the "normal" MRI and x-ray tests are consistent with Dr. Chen's opinion, and his physical examination of Plaintiff formed the basis for his conclusion regarding Plaintiff's physical capacities. Although Plaintiff contends that Dr. Chen's examination consisted only of an evaluation of Plaintiff's knee (Doc. 9 at 13), the record reveals otherwise. The record establishes that Plaintiff's chief complaint was her knee, but Dr. Chen's examination was not limited to her knee (*see* Tr. 361). Among other things, Dr. Chen reviewed Plaintiff's x-rays and MRIs, took her blood pressure, physically examined her neck and abdomen, observed her gait, tested her deep tendon

---

[16]Although not noted by the ALJ, it is interesting that Dr. Raney opined that Plaintiff's shortness of breath would prevent her from standing or walking more than five minutes, but his answer to a question on the same form regarding whether Plaintiff should be restricted from activities involving exposure to dust, fumes or gases was "don't know" (Tr. 304). It is unclear why Dr. Raney was unable to provide an answer to that question, especially if he had a clear understanding of the limitations caused by Plaintiff's asthma.

reflexes, and conducted range of motion testing of Plaintiff's neck, low back, knee, and extremities (Tr. 361–62).  Ultimately he assessed left knee sprain <u>and</u> cervical strain; thus, he obviously evaluated more than Plaintiff's knee (*see* Tr. 362), and the court finds that the ALJ did not err is assigning significant weight to the opinion of Dr. Chen.

Similarly, Plaintiff contends the ALJ erred in failing to assign significant weight to the opinion of Dr. Stinnett, a chiropractor, as set forth in her functional assessment dated September 23, 2003 (Doc. 9 at 19; Tr. 20, 380–84).[17]  The ALJ was required to consider her opinion, and he did, but he rejected the opinion and provided reasons for doing so.  First, the ALJ found that Dr. Stinnett's report was internally inconsistent (Tr. 20).  At one place in the assessment she indicated that Plaintiff's allegation of pain was consistent with her clinical findings (Tr. 20, 209, 382), yet later in the assessment she indicated that Plaintiff did not have an underlying medical condition consistent with the pain she experienced (Tr. 20, 211, 384).  The ALJ also considered that Dr. Stinnett's evaluation was based on Plaintiff's subjective complaints as to pain, as her records did not contain any objective testing to verify Plaintiff's complaints (Tr. 20, 308–32, 345–58).  Moreover, although chiropractic evidence may be considered in determining the severity of an impairment or how it may affect a claimant's ability to work, chiropractors are not granted the same status as other licensed medical practitioners under the rules governing Social Security claims.  20 C.F.R. § 404.1513 (2003).  Thus, the ALJ did not err in rejecting Dr. Stinnett's opinion.

B.      Eleventh Circuit Pain Standard

Plaintiff next alleges that the ALJ erred in evaluating her subjective complaints of pain (Doc. 9 at 16–18).

Pain is treated by the Regulations as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929.  In <u>Hand v. Heckler</u>, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

[17]Plaintiff's arguments have been rearranged for organizational purposes.

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991); Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard."  Wilson, supra, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."  Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence."  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker, 826 F.2d at 1003).  However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  Id.; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the Plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true."  MacGregor v. Bowen, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole."  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for

disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[18]   People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." Hand, supra, at 1548–49. It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence." Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that. The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

In the instant case, the ALJ specifically referenced 20 C.F.R. § 404.1529, and after discussing Plaintiff's daily activities and medical history, found that "the objective evidence of record is not consistent with [Plaintiff's] complaints" and "does not fully support [Plaintiff's] complaints" (Tr. 18–20). The ALJ additionally stated that he found that Plaintiff's impairments could reasonably be expected to produce the symptoms she alleged, but that Plaintiff's "statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible" (Tr. 18).        The ALJ provided several reasons for finding Plaintiff's complaints less than entirely credible. First, the ALJ discussed Plaintiff's daily activities, such as taking care of her personal

---

[18]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

needs and her disabled husband, making beds, washing dishes, cooking three times a week, and shopping once a week; the ALJ also noted that Plaintiff is "able to drive her child to school" (*id.*) — activities which are inconsistent with Plaintiff's complaints.  The ALJ may properly consider daily activities when evaluating subjective complaints of disabling pain and other symptoms.  *See* Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).  Plaintiff contends, however, that the ALJ mischaracterized Plaintiff's description of her daily activities. Thus, a review of the record is in order.  As noted *supra*, in Part IV.A, Plaintiff's description of her daily activities was not entirely consistent.  Nevertheless, the court finds that overall the ALJ correctly summarized Plaintiff's daily activities.  For example, Plaintiff specifically testified that, although she does not drive her children to school every day, she has a driver's license and had taken her children to school the day before her hearing (Tr. 455, 465).  Plaintiff also admitted that she is able to drive, even though she does not drive often, and noted that she had driven to her doctor's office in Pensacola (presumably from Walnut Hill, Florida, where she lives (*see, e.g.*, Tr. 81)) (Tr. 133).  Thus, she is "able to drive her child to school," as indicated by the ALJ.  Plaintiff also testified, as summarized by the ALJ, that she makes up or "straightens" her children's beds daily, she cooks three times a week, she "sometimes" (which Plaintiff explained means "about three times a week") washes dishes, she does some sweeping, and she grocery shops once a week (Tr. 452–56). Moreover, Plaintiff specifically stated that she cares for her personal needs, such as feeding, bathing, and dressing (Tr. 465).[19]  Although the court has not found a specific place in the record documenting that Plaintiff "cares for her disabled husband," the record confirms that he is indeed disabled and drawing SSI and that he lives with Plaintiff (Tr. 463).  Thus, given his disability, it would be logical for the ALJ to conclude that when Plaintiff cooked, shopped, or cleaned the house, that she did this for both herself and her husband.  Additionally, the record reflects that Plaintiff's daughter helped around the house, but Plaintiff did not indicate that her daughter took care of Plaintiff's husband or that her husband had any other source of outside help (*see, e.g.*, Tr. 456, 463).

---

[19]As the ALJ noted, "[Plaintiff] does require some assistance; however, overall she is able to maintain her household and independently take care of her personal needs." (Tr. 18).  Although Plaintiff's descriptions of her activities show some limitations, the ALJ is not required to believe all of a claimant's assertions concerning her activities.  *See* Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).

Nevertheless, the ALJ's characterization of Plaintiff's daily activities is otherwise accurate and was a proper consideration in evaluating Plaintiff's credibility. Furthermore, Plaintiff's daily activities were not the only reason the ALJ found Plaintiff's complaints less than credible.

In further support, the ALJ stated that the objective evidence does not fully support Plaintiff's complaints of disabling symptoms (Tr. 18). In particular, the ALJ noted the MRI test results of Plaintiff's cervical spine and left knee, both of which revealed no significant abnormality (Tr. 19). The ALJ also noted Plaintiff's conservative care and the fact that her conditions were well controlled with medication (Tr. 20), both of which are proper considerations. Wolfe, 86 F.3d at 1078 (ALJ may properly consider treatment that is "entirely conservative in nature" in discrediting a claimant's testimony); Dawkins, 848 F.2d at 1213 (medical conditions that can reasonably be remedied by medication are not disabling). The ALJ also referenced the results of Dr. Chen's physical examination (Tr. 21), which were inconsistent with Plaintiff's allegations. Finally, as alluded to by the ALJ, Plaintiff missed appointments with her physician (see, e.g., Tr. 20). For example, although Plaintiff alleged an onset of disability of March 30, 2003, she missed appointments with Dr. Raney shortly thereafter, when it would seem she most needed his treatment (see, e.g., Tr. 216 (no-show on June 2, 2003); Tr. 214 (no-show on July 28, 2003)). Additionally, the record reflects a history of "no-shows" for scheduled appointments with Dr. Raney prior to Plaintiff's alleged onset of disability (see, e.g., Tr. 225 (no-show on March 7, 2002); Tr. 224 (no-show on June 6, 2002); Tr. 220 (no-show on March 13, 2003)).

In conclusion, the court finds that the ALJ did not err, as he properly applied the pain standard and provided reasons with substantial support in the record for discounting Plaintiff's allegations of disabling pain.

C.     Consideration of Plaintiff's Obesity

Plaintiff next contends that the ALJ failed to properly consider her obesity in determining whether her lung condition or asthma met or equaled a listed impairment and in determining her RFC (Doc. 9 at 14). The crux of Plaintiff's argument is that the ALJ "failed to recognize Plaintiff's obesity as a diagnosis or severe impairment even though it was evident at the hearing" (Doc. 9 at 15) (emphasis supplied).

The ALJ determined that Plaintiff did not meet listing 3.02B, entitled Chronic Pulmonary Insufficiency (Tr. 17).  The ALJ's finding was based on the fact that Plaintiff's pulmonary function test results did not reveal FVC values considered disabling under the listing (Tr. 17, 178–81, 369).  The ALJ also considered whether Plaintiff met a listed impairment for asthma.  To do so, Plaintiff must meet the requirements for chronic obstructive pulmonary disease as evaluated under § 3.02A or the evidence must document:

> Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.03B.  An "attack," as referred to in this section, is defined as "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.00C.  The ALJ properly found that Plaintiff experienced only one attack which required emergency room treatment (Tr. 17, 166).  Thus, Plaintiff did not meet the listing for asthma.

Plaintiff argues, however, that the ALJ failed to consider her obesity in determining that she did not meet these listings (*see* Doc. 9 at 14-16), asserting that the ALJ was required to consider the effects of her obesity under § 3.00I.  Plaintiff, however, was not diagnosed with obesity by her treating physicians (Tr. 212–19, 359–60, 386–90, 397–400, 409–16).  *Cf.* Early v. Astrue, 481 F. Supp. 2d 1233, 1239 (N.D. Ala. 2007) (ALJ erred in failing to consider obesity as a factor in determining claimant's RFC where her treating physicians repeatedly listed obesity in their treatment notes).  Further, no physician suggested that Plaintiff's obesity imposed any additional work-related limitations, and Plaintiff did not testify that it imposed additional restrictions.  *See, e.g.*, Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003) (claimant "never alleged any limitation in function as a result of his obesity in his application for benefits or during the hearing"; thus, his claim was waived from being raised on appeal); James v. Barnhart, 177 Fed. Appx. 875, 878 n.2 (11th Cir. 2006) (unpublished opinion) (ALJ did not err by failing to find obesity a severe

impairment where, during her own testimony, plaintiff did not claim that her obesity was a functional impairment).[20]  Indeed Plaintiff asserts that the ALJ should have simply noticed Plaintiff's obesity at her hearing, as it was "evident."  The ALJ, however, is under no "obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability."  *See* Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996) (quoting Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th Cir. 1993)).  *See also* 20 C.F.R. § 404.1512 (requiring that a claimant "bring to our attention everything that shows that you are . . . disabled").  Thus, the ALJ did not err.

      D.      Testimony of the VE

      Finally, Plaintiff contends the ALJ erred in failing to rely on the VE's response to certain hypothetical questions.  In particular, Plaintiff contends that the ALJ should have relied on the VE's response to questions that included all the limitations that were established by Dr. Raney and Dr. Stinnett (Doc. 9 at 19).

      As the court is well aware, a hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.  Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).  However, the ALJ is not required to include findings in the hypothetical that he has properly rejected as unsupported.  *See* McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).  For the reasons discussed *supra*, the ALJ properly discounted the opinions of Dr. Raney and Dr. Stinnett.  Thus, the ALJ was not required to include all of their limitations in questions posed to the VE, or conversely, was not required to rely on responses to hypothetical questions that contained their properly discredited opinions.  Therefore, the ALJ did not err in determining that Plaintiff could return to her past relevant work as a cook (medium), caterer helper (light) or cashier (sedentary) and, correspondingly, did not err in finding that she is not disabled under the Act.

      For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.

---

[20]Although opinions from other district courts and unpublished opinions are not binding on this district court, they may be considered persuasive authority.  *See* Fishman & Tobin, Inc. v. Tropical Shipping & Const. Co., Ltd., 240 F.3d 956, 965 (11th Cir. 2001); United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000); 11th Cir. R. 36–2.

Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 22nd day of October 2007.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**